IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH AJUZ | : | |
| | : | |
| v. | : | NO. 07-MC-0185 |
| | : | |
| MICHAEL B. MUKASEY, ET AL. | : | |

**SURRICK, J.**                                                                                                  **APRIL  2 , 2009**

### MEMORANDUM & ORDER

Presently before the Court is Kenneth Ajuz's Petition for Review of Denial of Application for Naturalization. (Doc. No. 1.) We conducted a hearing and reviewed *de novo* the denial of Petitioner's Application for Naturalization. For the following reasons, the Application for Naturalization must be denied.

**I.      FINDINGS OF FACT**

Kenneth Ajuz ("Petitioner") was born on November 17, 1965, in Nigeria. (Gov't Ex. 4 at p. 2.) Petitioner lawfully entered the United States in 1983 with a student visa and enrolled in college in Louisiana. (Tr. at 7-8.) Petitioner studied chemistry and learned to read and write English. (*Id.* at 38.) He obtained a bachelor's degree in chemistry from the University of Tennessee, and he has been working steadily ever since. (*Id.* at 8, 34, 38.) Presently, Petitioner is employed as a chemist. (*Id.* at 7.) He pays his taxes and has no criminal record. (*Id.* at 34.)

In 1993, Petitioner's father filed an Immigrant Petition for Relative ("Form F-29") on Petitioner's behalf so that he could begin the process of becoming a lawful permanent resident, and eventually a citizen. (*Id.* at 9.) The immigrant petition classified Petitioner as an unmarried child of a lawful permanent resident. (*Id.*) Petitioner had to wait six-and-a-half years for that petition to be granted. (*Id.* at 10.) Once it was granted, Petitioner was classified as an unmarried

child of a lawful permanent resident. (*Id.*)

On May 1, 2000, Petitioner applied for permanent residency ("Form I-485") with the assistance of an attorney. (*Id.* at 13.) Petitioner was not married at the time and he so indicated on his application for permanent residency, consistent with his immigration classification as an unmarried child of a lawful permanent resident. (*Id.* at 13-14.) On June 3, 2000, a month later, Petitioner got married while his application for lawful permanent residency was pending. (*Id.* at 39.)

On August 9, 2000, an immigration officer, David Spaulding ("Spaulding"), interviewed Petitioner under oath as part of the application process for lawful permanent residency. (*Id.* at 15-16, 31.) During that interview, Spaulding asked Petitioner a three-part question: Are you married? Have you ever been married? Have you ever been married anywhere at anytime? (*Id.* at 16-17, 53-54, 62.) Petitioner answered "no," that he was not married, had never been married, and had never been married anywhere at anytime.[1] (*Id.* at 53.) Petitioner would have been ineligible for permanent residency if he had told Spaulding that he had married a few months earlier, because Petitioner was considered to be an *unmarried* son of a lawful permanent resident and his wife had not filed a separate application on his behalf. (*Id.* at 55-57, 88.) In January 2001, Petitioner's application for lawful permanent residency was granted. (*Id.* at 22, 40.)

Petitioner understood that he had to wait five years after he received lawful permanent residency before he could apply for naturalization as a citizen. (*Id.* at 25.) On February 23,

---

[1] Petitioner believed that Spaulding was asking about his marital status at the time that he filled out the I-485 application. (Tr. at 32.) At the time Petitioner filled out the application a few months before the Spaulding interview, he was not married and had never been married anywhere at anytime. (*Id.* at 26.)

2

2006, after waiting the necessary five years, Petitioner applied for naturalization ("Form N-400"). (*Id.* at 22-23; Gov't Ex. 4, at p. 1.) Petitioner took the U.S. history and civics test required of candidates for naturalization. (Tr. at 33-34.) Petitioner received a perfect score. (*Id.*) On his application for naturalization, Petitioner indicated that he became a permanent resident on January 2, 2000, and that he got married on June 3, 2000. (*Id.* at 24, 43; Gov't Ex. 4, at pp. 2, 4.) In actuality, Petitioner had become a permanent resident on January 2, 2001, not in 2000. (Tr. at 40.) Petitioner's error made it appear as though he was a permanent resident at the time of his marriage. (*See id.* at 43.)

Lucy Anne Noel ("Noel"), an immigration officer, reviewed Petitioner's file in anticipation of Petitioner's naturalization interview. (*Id.* at 26, 73.) Noel noticed the discrepancy with the date of Petitioner's permanent residency. (*Id.* at 73-74.) She discovered that Petitioner's class of admission as an unmarried child of a lawful permanent resident would not be valid because Petitioner's records indicated that he married before he was granted permanent residency. (*Id.* at 74.) In an effort to resolve the discrepancy, Noel spoke to Spaulding about Petitioner's August 9, 2000 interview for permanent residency. (*Id.*) Noel was satisfied that Spaulding had asked Petitioner if he was married anytime, anywhere. (*Id.* at 74, 78.) Petitioner's response to that question at the interview was "no." (*Id.* at 53.) Noel thought that since Petitioner provided the incorrect date for his permanent residency, perhaps his marriage date was incorrect, as well, and Petitioner might still be eligible for naturalization. (*Id.* at 74-75.) Since Petitioner had not attached his marriage certificate to his naturalization application, Noel could not immediately verify the date. (*Id.* at 76.)

On June 12, 2006, Noel interviewed Petitioner as part of the application for

3

naturalization. (*Id.* at 26, 36.) At Noel's prompting, Petitioner corrected certain details on his naturalization application that had changed since he filled out the form, including his address, telephone number, county of residence, and, notably, the date of his permanent residency. (*Id.* at 42-43.) Petitioner told Noel that January 2, 2001, was the correct date of his permanent residency and made the appropriate correction on the application. (*Id.* at 75.) Noel asked Petitioner for his marriage certificate and discovered that the date of his marriage was correct in the application. (*Id.* at 76.) Noel then asked Petitioner, among other things, the following two questions:

> Have you ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal?
>
> Have you ever lied to any U.S. government official to gain entry or admission into the United States?

(Gov't Ex. 4, p. 8; Tr. at 71.) Petitioner answered both questions, "no." (Tr. at 71.)

Noel explained to Petitioner that based on her review of Spaulding's notes from the prior interview for lawful permanent residency, Petitioner's marriage date could pose a conflict with his application. (*Id.* at 30, 76.) Noel asked Petitioner why he told Spaulding that he was not married when, in fact, he had married several months earlier. (*Id.* at 76-77.) Petitioner told Noel that "he did not do it intentionally," and that is was a "misunderstanding." (Tr. at 77.) Petitioner submitted a sworn statement to Noel under the heading, "Explanation of Why False Information Was Given During Your I-485 Interview," as follows:

> At the time I filed, May 1, 2000, the I-485, I wasn't officially married. I mistakenly told the officer at the interview session that I was not married. My reason to answer [sic] the office [sic] no was because I thought the question was about the time I signed the I-485 petition. I have no intention in [sic] providing false information, but this was just a misunderstanding.

4

(Gov't Ex. 4; Tr. at 32.)

On December 11, 2006, Petitioner's application for naturalization was denied on the grounds that Petitioner had not resided continuously within the United States for at least five years after being "lawfully admitted" for permanent residence. (Gov't Ex. 5.) The officer found that Petitioner was not "lawfully admitted" into the United States for permanent residence in 2001 because he was married at that time and therefore not eligible for permanent residence under the approved immigrant relative petition. (*Id.*; Tr. at 87.)

Petitioner appealed the decision, and the denial was affirmed on July 24, 2007. (Gov't Ex. 6.) On appeal, the reviewing officer found that Petitioner was not a "person of good moral character" as required by 8 C.F.R. § 316.2(a), because during the June 12, 2006 interview for naturalization with Noel, he "obtained legal permanent resident status by fraud" by answering "no" to the questions, "Have you ever lied to any U.S. government official to gain entry of admission to the U.S.?" and "Have you ever given false testimony or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?" (*Id.*) The officer found that the answers were fraudulent because Petitioner "responded in the negative when asked if [he was] married" during the August 9, 2000 interview, when in fact he had married a few months earlier. (*Id.*)

Petitioner filed the instant Petition seeking *de novo* review of his naturalization application. A hearing was held at which testimony was taken, and the matter is now ripe for disposition.

## II.     STANDARD OF REVIEW

The denial of a Naturalization Application is reviewed *de novo* by a district court pursuant to the Immigration and Nationality Act, which provides:

> A person whose application for naturalization . . . is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court for the district in which such person resides. . . . Such review shall be *de novo*, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing *de novo* on the application.

8 U.S.C. § 1421; *see also Aparicio v. Blakeway*, 302 F.3d 437, 440 (5th Cir. 2002) ("Rather than conducting an administrative review, the district court reviews the case *de novo* and makes its own findings of fact and conclusions of law."); 8 C.F.R. § 336.9(a) ("[8 U.S.C. § 1421(c) provides] the sole and exclusive procedures for requesting judicial review of final determinations on applications for naturalization . . . ."); *Mocanu v. Mueller*, No. 07-0445, 2008 WL 154606, at *2 (E.D. Pa. Jan. 11, 2008) (discussing *de novo* review and naturalization process). A district court "must decide the issues upon the testimony which it hears, and . . . neither the testimony heard by the [Immigration] Examiner, his findings, nor his recommendation are of any consequence." *Application of Murra*, 178 F.2d 670, 672 (7th Cir. 1949) (citation and quotation marks omitted). As the United States Court of Appeals for the Tenth Circuit has noted, "[t]his grant of authority is unusual in its scope – rarely does a district court review an agency decision *de novo* and make its own findings of fact." *Nagahi v. INS*, 219 F.3d 1166, 1169 (10th Cir. 2000); *see also Aparicio*, 302 F.3d at 445 ("Judicial review of naturalization denials is always available and is *de novo*, and is not limited to any administrative record but rather may be on facts established in and found by the district court.").

### A.     Requirement of Showing of Good Moral Character

To be eligible for naturalization, an applicant must show that he is "a person of good moral character."[2]  8 U.S.C. § 1427(a)(3); *see also* 8 C.F.R. § 316.2(a)(7) (setting forth eligibility requirements for naturalization including good moral character).  The statutory period for which good moral character is required begins five years before the application for naturalization is filed, and continues until the applicant becomes a United States citizen.  *See* 8 U.S.C. § 1427(a)(3).  Determinations of good moral character must be made "on a case-by-case basis taking into account the elements enumerated in [8 C.F.R. § 316.10] and the standards of the average citizen in the community of residence."  8 C.F.R. § 316.10(a)(2).  The burden is on the applicant to demonstrate that, during the statutorily prescribed period, he has been and continues to be a person of good moral character.  *See id.* § 316.10(a)(1) ("An applicant for naturalization bears the burden of demonstrating that, during the statutorily prescribed period, he or she has been and continues to be a person of good moral character.").

Congress has erected several statutory bars to a finding that an applicant possesses good moral character.  According to 8 U.S.C. § 1101,

> No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was –
> . . .
> one who has given false testimony for the purpose of obtaining any benefits under

---

[2] In pertinent part, the statute provides as follows:

No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant, . . . (3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

8 U.S.C. § 1427(a).

7

this chapter . . . .

8 U.S.C. § 1101(f)(6).  The Supreme Court has interpreted § 1101(f)(6) to "mean[ ] precisely what it says" – a person may lack good moral character "on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits."  *Kungys v. United States*, 485 U.S. 759, 779-80 (1988); *see also Nguyen v. Monica*, No. 05-1321, 2006 WL 3437543, at *3 (M.D. Pa. Nov. 29, 2006) (noting that "the lie or dishonesty must be with the subjective intent of obtaining immigration benefits") (quotations omitted).  "It is only dishonesty accompanied by this precise intent that Congress found morally unacceptable."  *Kungys*, 485 U.S. at 780 (quotations omitted); *see also United States v. Schiffer*, 831 F. Supp. 1166, 1199 (E.D. Pa. 1993), *aff'd*, 31 F.3d 1175 (3d Cir. 1994) ("Good moral character is lacking whenever there is a subjective intent to deceive.").  Hence, "false testimony due to a misunderstanding, a misinterpretation, or an innocent mistake is insufficient to deny citizenship for lack of good moral character."  *Saad v. Barrows*, No. 03-1342, 2004 WL 1359165, at *6 (N.D. Tex. Jun. 16, 2004) (citing *Plewa v. INS*, 77 F. Supp. 2d 905, 912 (N.D. Ill. 1999)); *see also United States v. Hovsepian*, 422 F.3d 883, 887-88 (9th Cir. 2005) (en banc) (affirming finding of good moral character where misstatements in naturalization application resulted from misinterpretation and innocent mistake); *Cacho v. Ashcroft*, 403 F. Supp. 2d 991, 996 (D. Haw. 2004) (noting that "false testimony for purposes of establishing good moral character 'applies only to those misrepresentations made with the subjective intent of obtaining immigration benefits'") (citing *Kungys*, 485 U.S. at 780); *Poka v. INS*, No. 01-1378, 2002 WL 31121382, at *4 (D. Conn. Sept. 19, 2002) (finding that "misrepresentations were not made with the requisite subjective intent of offering false

testimony" where they were the result of confusion and misunderstanding); *DeLuca v. Ashcroft*, No. 01-0380, 2002 WL 1032592, at *3 (M.D. Ala. May 16, 2002) (finding "no evidence of bad moral character" where petitioner erroneously stated that she had not been arrested based on a misinterpretation); *Chan v. INS*, No. 00-0243, 2001 WL 521706, at *8 (E.D.N.Y. May 11, 2001) (granting application for naturalization where the petitioner's statements "were not misrepresentations aimed to deceive the INS; rather they appear to be the consequences of [the petitioner's] confusion, misunderstandings, limited command of English, and lack of a full appreciation of the factors that would constitute and render impregnable his arrest under the American legal system").

  **B.**  **Requirement of Showing of Lawful Permanent Resident Status**

In addition to a showing of good moral character, an applicant must show that he is a lawful permanent resident of the United States in order to be eligible for naturalization. *See* 8 U.S.C. § 1427(a) (requiring that the applicant for naturalization be "lawfully admitted for permanent residence").[3] The term "lawfully admitted for permanent residence" is defined as

---

[3] In pertinent part, the statute provides as follows:

> No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, [and] (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship . . . .

8 U.S.C. § 1427(a).

"the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed."  8 U.S.C. § 1101(a)(20).  The applicant has the burden of proving that he was lawfully admitted to the United States for permanent residence.  *See* 8 U.S.C. § 1429 ("[N]o person shall be naturalized unless he has been lawfully admitted as a permanent resident."); 8 C.F.R. § 316.2(b) (requiring that the naturalization applicant "shall bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization, including that the applicant was lawfully admitted as a permanent resident to the United States"); *see also Aparicio*, 302 F.3d at 440 (noting that applicant for naturalization has the burden of proving that he was "lawfully admitted to the United States for permanent residence"); *In re Ferenci*, 217 F. Supp. 714, 716 (E.D. Pa. 1963) (noting that "no person shall be naturalized unless he sustains the burden of proving that he was lawfully admitted to the United States for permanent residence").  "[A]n alien whose status has been adjusted to lawful permanent resident but who is subsequently determined in an immigration proceeding to have originally been ineligible for that status has not been 'lawfully admitted for permanent residence' because the 'alien is deemed, *ab initio*, never to have obtained lawful permanent resident status.'"  *De La Rosa v. U.S. Dep't of Homeland Sec.*, 489 F.3d 551, 554 (2d Cir. 2007) (per curiam) (internal citation omitted); *see also Savoury v. U.S. Atty. Gen.*, 449 F.3d 1307, 1317 (11th Cir. 2006) (noting that "'lawfully admitted' means more than admitted in a procedurally regular fashion. . . .  It means that the alien's admission to the status was in compliance with the substantive requirements of the law").

### III.     CONCLUSIONS OF LAW

We find that Petitioner has demonstrated that, during the statutorily prescribed period, he has been and continues to be a person of good moral character. *See* 8 C.F.R. § 316.10(a)(1) (outlining elements of good moral character). Petitioner has been gainfully employed as a chemist, pays his taxes, and has no criminal record. He received a perfect score on his U.S. history and civics examination. We reject the immigration officer's conclusion that Petitioner obtained legal permanent resident status by fraud. Spaulding asked Petitioner at the August 9, 2000 interview for permanent residency if he was married, if he has ever been married, and if he has ever been married anywhere at anytime. Petitioner answered "no," believing that his marriage a few months earlier had nothing to do with his immigration paperwork. (Tr. at 20.) Petitioner made an innocent mistake. He did not conceal the marriage in his naturalization application, and, in fact, he provided the date of his marriage and his wife's name. (Gov't Ex. 4.) Although Petitioner mis-dated the year of his naturalization, we do not believe he made the error with any intent to deceive because he corrected the error at his naturalization interview. Petitioner's testimony was credible.

We also conclude that Petitioner did not intend to deceive Noel during the naturalization interview. Noel asked Petitioner the following two questions at the naturalization interview:

> Have you ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal?

> Have you ever lied to any U.S. government official to gain entry or admission into the United States?

(Gov't Ex. 4, p. 8; Tr. at 71.) Petitioner answered both questions, "no." (Tr. at 71.) We find that Petitioner gave credible testimony that he believed his answer was truthful. In his sworn statement that accompanied his naturalization application, Petitioner clarified that "[he]

11

mistakenly told the officer at the interview session that [he] was not married [. . . ] because [he] thought the question was about the time [he] signed the I-485 petition." (Gov't Ex. 4.) Petitioner reiterated this misunderstanding during his testimony at trial:

> Q: At the time that you were testifying before the immigration officer, were you placed under oath?
> A: Yes.
> Q: At that time, did you understand that being married would have had an [e]ffect – a negative [e]ffect with regards to the present petition before that officer?
> A: No.
> Q: When you say no, you never discussed that with your counsel?
> A: No. It never [sic] been brought up.
> Q: At the time of the interview, why did you not amend your application? Or why did you not inform the officer that you were married?
> A: It was in front of – I wasn't aware that being married has anything to do with the petition at the time . . . .
> A: My understanding when I went in and from my discussions was that my marriage had nothing to do with the government's paperwork. My belief was I was coming [sic] all the documents at the time of my filing[.]

(Tr. at 16-17, 20.)

We find that Petitioner's statement about his marital status at the interview was not true since Petitioner undisputedly got married on June 3, 2000. However, we find no intent to deceive. Petitioner's statement was due to his misunderstanding of Spaulding's question. Petitioner thought he was answering questions based on the date of his application. He did not discuss the effect of his marital status with an attorney. He listed his spouse and marriage date on his naturalization application, undermining any inference that Petitioner intended to deceive Noel. False testimony due to a misunderstanding is insufficient to deny citizenship for lack of good moral character. *See Plewa*, 77 F. Supp. 2d at 910 ("[F]alse testimony coupled with an intent to deceive for the purpose of obtaining citizenship or other benefits is required in order to deny a citizenship application under 8 U.S.C. § 1101(f)(6)."); *Cacho*, 403 F. Supp. 2d at 996

("[F]alse testimony for purposes of establishing good moral character 'applies only to those misrepresentations made with the subjective intent of obtaining immigration benefits.'") (*quoting Kungys*, 485 U.S. at 780); *Poka*, 2002 WL 31121382, at *4 (finding that "misrepresentations were not made with the requisite subjective intent of offering false testimony" where they were the result of confusion and misunderstanding).

Even though we find that Petitioner is of "good moral character," we find that Petitioner is not eligible for naturalization. To be eligible for naturalization, Petitioner must show that he was "lawfully admitted for permanent residence." 8 U.S.C. § 1427(a). In the five-year period prior to Petitioner's application for naturalization, Petitioner was not lawfully admitted into the United States for permanent residence. On January 2, 2001, the date of Petitioner's adjustment of status to that of a permanent resident, he was married and thus not eligible for permanent residence under the approved immigrant relative petition. *See id.* The regulations provide for automatic revocation of Petitioner's immigrant visa on June 3, 2000, the date of his marriage.[4] *See* 8 C.F.R. § 205.1(a)(3)(i) (providing for "automatic revocation" of the approval of a petition as of the date of approval if, "before the decision on [the petitioner's] adjustment application

---

[4] The Secretary of Homeland Security "may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved by him under [8 U.S.C. § ] 1154." 8 U.S.C. § 1155. Pursuant to this statute, the Department of Homeland Security has promulgated regulations that provide for automatic revocations, *see* 8 C.F.R. § 205.1, and discretionary "revocations on notice," *see id.* § 205.2. "Approval of a . . . petition for the unmarried adult child of a lawful permanent resident is automatically revoked upon the marriage of that child, *id.* § 205.1(a)(3)(i)(I), if the marriage occurs after the approval is issued and 'before the decision on [the beneficiary's] adjustment application becomes final, *id.* § 205.1(a)(3).'" *Pierre v. U.S. Atty. Gen.*, 300 Fed. App'x 870, 872 (11th Cir. 2008) (unpublished opinion). While there is authority for the automatic revocation of the approval of Petitioner's immigrant visa, it does not appear that the approval was actually revoked in this case. Nevertheless, the provision for automatic revocation militates against the conclusion that Petitioner was eligible for permanent residence under his approved immigrant relative petition.

13

becomes final," the unmarried child of a lawful permanent resident becomes married). Moreover, an alien whose status has been adjusted to lawful permanent resident but who is subsequently determined to have originally been ineligible for that status "has not been 'lawfully admitted for permanent residence' because the 'alien is deemed, *ab initio*, never to have obtained lawful permanent resident status.'" *De La Rosa*, 489 F.3d at 554. Because Petitioner was married and therefore not eligible for permanent residence under the approved immigrant relative petition, he was not lawfully admitted as a permanent resident and is not eligible for naturalization at this time. *See, e.g.*, *Flerinord v. Mukasey*, No. 05-8920, 2008 WL 2465035, at *3 (S.D.N.Y. June 18, 2008) (finding that the government was "substantially justified in denying [the] petitioner's application for naturalization" since the petitioner entered the United States in June 1999 as an unmarried son of a citizen but had married in December 1998).

  A recent case from the Third Circuit supports this conclusion. *See Robinson v. Napolitano*, 554 F.3d 358, 360 (3d Cir. 2009). In *Robinson*, the petitioner lawfully entered the United States and married a United States citizen. *Id.* After the marriage, the petitioner filed an I-485 application to adjust her immigration status to that of a lawful permanent resident. *Id.* Less than a year after the marriage, the petitioner's husband died while the application was pending. *Id.* The government informed the petitioner that her petition automatically terminated upon the death of her husband since he was no longer an "immediate relative" under the INA. *Id.* The petitioner filed a complaint in the district court requesting, *inter alia*, that the court order the government to treat her as an "immediate relative" notwithstanding her husband's death. *Id.* The petitioner argued that her status as an immediate relative "vested" when she filed the petition. *Id.* at 363. Since the petitioner was married at the time of her application, she argued

that her status carried forward until the government approved the application. *Id.* The Third Circuit rejected the petitioner's argument, holding that "eligibility for an immediate relative visa depends upon the alien's status at the time USCIS adjudicates the . . . petition, not when that petition was filed." *Id.* at 364. Thus, it is the petitioner's status at the time of adjudication that is determinative. The petitioner's status at the time of filing "merely shows that eligibility at the time of filing is a necessary condition for the grant of a petition; it does not establish that eligibility at that time is sufficient" if there is a subsequent change in status before adjudication. *Id.*

As in *Robinson*, Petitioner here was eligible for a change in status at the time of his filing but not at the time of adjudication. Specifically, Petitioner was entitled to permanent residency status at the time of his application (when he was unmarried) but not at the time of adjudication (when he was married). Petitioner's status at the time of adjudication is controlling. *See Robinson*, 554 F.3d at 360. Because Petitioner married after filing the petition for lawful permanent resident status but before that petition was adjudicated, he was not eligible to adjust his immigration status to lawful permanent resident from unmarried son of a lawful permanent resident. Petitioner was therefore not "lawfully admitted for permanent residence" for purposes of naturalization. *See, e.g.*, *De La Rosa*, 489 F.3d at 554-55 (holding that alien who has been granted adjustment to lawful permanent resident status has not been "lawfully admitted for permanent residence" when originally ineligible for that status). We are not unsympathetic to Petitioner's situation in having married two months before the approval of his application for lawful permanent residency, thereby making himself ineligible for naturalization despite many years of waiting. However, our sympathy does not allow us to ignore the statutory requirements

for naturalization that Congress created.[5]  We are obligated to apply the law as written and as interpreted by the Third Circuit and the Supreme Court, and doing so does not afford Petitioner the requested relief.

### III.     CONCLUSION

We conclude that Petitioner was of "good moral character" during the five-year period preceding his application for naturalization.  Nevertheless, we find that Petitioner's marriage rendered him ineligible for naturalization under 8 U.S.C. § 1427(a), since he gained lawful permanent resident status as an unmarried child of a lawful permanent resident when, in fact, he was married at the time of the adjudication.  Petitioner's Application for Naturalization is therefore denied.

An appropriate Order follows.

---

[5] The dissent in *Robinson* observed that "it is inconceivable . . . that Congress intended an alien's status to be contingent upon the amount of time that the executive department takes to process a timely and proper petition – a factor completely outside of the control of the alien." *Robinson*, 554 F.3d at 371 (Nygaard, J., dissenting).  We share this observation, but the timing of Petitioner's marriage in this case was entirely within his control.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH AJUZ | : | |
| | : | |
| v. | : | NO. 07-MC-0185 |
| | : | |
| MICHAEL B. MUKASEY, ET AL. | : | |

**ORDER**

AND NOW, this __2nd__ day of April, 2009, upon consideration of Petitioner's Petition for Review of Denial of Application for Naturalization (Doc. No. 1) and all documents submitted in support thereof and in opposition thereto, and after a hearing, it is ORDERED that Petitioner's Application for Naturalization is DENIED.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, J.